UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| KATHRYN L. WATERS, | : | 1:13-CV-02652 |
| | : | |
| Plaintiff | : | (Judge Kane) |
| | : | |
| v. | : | (Magistrate Judge Schwab) |
| | : | |
| PENNSYLVANIA HUMAN | : | |
| RELATIONS COMMISSION, | : | |
| | : | |
| Defendant | : | |

**REPORT AND RECOMMENDATION**

**I.  Introduction.**

In this employment discrimination case, the plaintiff, Kathryn L. Waters, claims that the defendant, the Pennsylvania Human Relations Commission (PHRC), discriminated against her because of her race in violation of Title VII by not hiring her as the Executive Director of the PHRC.   After the close of discovery, the PHRC filed a motion for summary judgment, which has been fully briefed and is ripe for decision.   Because there are genuine, material factual disputes, we recommend that the PHRC's motion for summary judgment be denied.

## II. Summary Judgment Standard.

The PHRC moved for summary judgment under Rule 56(a) of the Federal Rules of Civil Procedure, which provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Through summary adjudication the court may dispose of those claims that do not present a 'genuine dispute as to any material fact' and for which a jury trial would be an empty and unnecessary formality." *Goudy-Bachman v. U.S. Dept. of Health & Human Services*, 811 F. Supp. 2d 1086, 1091 (M.D. Pa. 2011)(quoting Fed.R.Civ.P. 56(a)).

The moving party bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the record which demonstrate the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). With respect to an issue on which the nonmoving party bears the burden of proof, the moving party may discharge that burden by "'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325.

Once the moving party has met its burden, the nonmoving party may not rest upon the mere allegations or denials of its pleading; rather, the nonmoving party

2

must show a genuine dispute by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" or "showing that the materials cited do not establish the absence . . . of a genuine dispute." Fed.R.Civ.P. 56(c).   If the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial," summary judgment is appropriate. *Celotex*, 477 U.S. at 322.   Summary judgment is also appropriate if the nonmoving party provides merely colorable, conclusory, or speculative evidence. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).   There must be more than a scintilla of evidence supporting the nonmoving party and more than some metaphysical doubt as to the material facts. *Id.* at 252.   "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986).

The substantive law identifies which facts are material, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson,* 477 U.S. at 248.   A dispute about a material fact is genuine only if there is a sufficient evidentiary basis

that would allow a reasonable fact finder to return a verdict for the non-moving party. *Id.* at 248-49.   When "faced with a summary judgment motion, the court must view the facts 'in the light most favorable to the nonmoving party.'" *N.A.A.C.P. v. N. Hudson Reg'l Fire & Rescue*, 665 F.3d 464, 475 (3d Cir. 2011)(quoting *Scott v. Harris,* 550 U.S. 372, 380 (2007)).

At the summary judgment stage, the judge's function is not to weigh the evidence or to determine the truth of the matter; rather it is to determine whether there is a genuine issue for trial. *Anderson,* 477 U.S. at 249.   The proper inquiry of the court "is the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Id.* at 250.

Summary judgment is warranted, after adequate time for discovery, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. *Celotex,* 477 U.S. at 322.   "Under such circumstances, 'there can be no genuine issue as to any material fact, since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.'" *Anderson v. CONRAIL*, 297 F.3d 242, 247 (3d Cir. 2002)(quoting

4

*Celotex,* 477 U.S. at 323).   "[S]ummary judgment is essentially 'put up or shut up'

time for the non-moving party: the non-moving party must rebut the motion with

facts in the record and cannot rest solely on assertions made in the pleadings, legal

memoranda, or oral argument." *Berckeley Inv. Group, Ltd. v. Colkitt,* 455 F.3d 195,

201 (3d Cir. 2006).


## III.   Material Facts.

A party who seeks to resist a summary judgment motion must comply with

Local Rule 56.1, which specifically provides that "[s]tatements of material facts in

support of, or in opposition to, a motion shall include references to the parts of the

record that support the statements" and that "[a]ll material facts set forth in the

statement required to be served by the moving party will be deemed admitted unless

controverted by the statement required to be served by the opposing party."   Under

this Rule, the failure to appropriately challenge the material facts tendered by the

defendant means that those facts must be deemed admitted.   Further, a party

opposing a motion for summary judgment may not "rely merely upon bare

assertions, conclusory allegations or suspicions." *Fireman's Ins. Co. of Newark v.*

*DuFresne,* 676 F.2d 965, 969 (3d Cir. 1982).   Rather, "[o]nce the moving party has

supplied sufficient affidavits in support of its motion, the opposing party must

respond by supplementing the record in some manner—whether by its own

affidavits or otherwise—setting forth specific facts demonstrating that there is a

genuinely disputed factual issue for trial." *Id.*   In accordance with the standard of

review for a motion for summary judgment, the following facts are either undisputed

or, where disputed, we accept the version of the facts asserted by Waters, the

nonmoving party.[1]

### A.   The PHRC.

The PHRC is an administrative commission of the Commonwealth of

Pennsylvania created by the Pennsylvania Human Relations Act (PHRA), 43 P.S.

§§951-963, to enforce and administer the PHRA, and it is also responsible for

administering the Pennsylvania Fair Educational Opportunities Act. *Doc. 43*

(Defendant's Statement of Material Facts in Support of Summary Judgment) at ¶1

and *Doc. 50* (Plaintiff's Response to Defendant's Statement of Material Facts) at ¶1.

---

[1]  In addition to responding to the PHRC's Local Rule 56.1 statement of material facts as required by Rule 56.1, Waters included a "Counter Statement of Facts" section in her brief in opposition to the PHRC's motion for summary judgment. The PHRC moved to strike that section of Waters's brief.   Because Local Rule 7.8(a) states that a brief in opposition to a motion "may contain a counter statement of the facts" and if a counter statement of facts is not filed, "the statements of the moving party will be deemed adopted," by a separate order, we denied the PHRC's motion to strike.

The PHRA is not intended to just protect minorities; rather, it is intended to fight discrimination based on race, color, familial status, religious creed, ancestry, age, sex, national origin, handicap or disability, and use of guide or support animals because of the blindness, deafness, or physical handicap of the user or because the user is a handler or trainer of support or guide animals. *Id*. at ¶2.   The PHRC is purportedly strongly committed to equal employment opportunity and non-discrimination. *Doc. 50* at ¶2.   This commitment extends to its role as an employer as well as to its mission as the chief civil-rights law-enforcement agency of the Commonwealth of Pennsylvania. *Id*.

The PHRC consists of eleven commissioners, who are appointed by the Governor and confirmed by the Senate. *Doc. 43* at ¶3 and *Doc. 50* at ¶3.   The PHRC was meant to be nonpartisan with no more than six commissioners from one political party. *Id*. at ¶4.   Six members of the PHRC constitute a quorum for conducting the business of the PHRC, and a majority vote of those present at a meeting is sufficient for any official action by the PHRC. *Id*. at ¶5.

### B.   The Search for a New Executive Director.

Homer Floyd was the Executive Director of the PHRC for 40 years before deciding to retire in January 2011. *Id*. at ¶6.   At that time, the eleven members of the

7

PHRC were Stephen Glassman (Chairman—white), Dr. Raquel Yiengst (Vice Chairperson—latino), Dr. Daniel Yun (Secretary—Asian), Rev. Dr. James Garmon (Assistant Secretary—black), Gerald Robinson, Esq. (black), M. Joel Bolstein, Esq. (white), Ismael Arcelay (latino), J. Whyatt Mondesire (black), S. Kweilin Nassar (white), Daniel Woodall (black), and Sylvia Waters (black).[2] *Id*. at ¶7.   Among other responsibilities, the Executive Director is responsible for the PHRC's budget, which the General Assembly appropriates for the PHRC's operations. *Id*. at ¶8. Prior to his retirement, Floyd revealed that the PHRC's budget was in significant deficit, in an amount of approximately $1.5 million. *Id*. at ¶9.   The deficit at the time of Homer Floyd's retirement was significant enough that it had a real effect on the PHRC. *Id*. at ¶10.   The qualifications the PHRC was looking for in a new Executive Director, as stated in the Job Bulletin, included:

> • The business and managerial acumen needed to head a complex organization with a strong management team, many of whom will be recently hired individuals;
> • The capability of managing and responding to an engaged group of commissioners with a strong commitment to [the] work of the PRHC; and

---

[2] Commissioner Sylvia Waters is married to Plaintiff Waters' Grandfather's Brother's son. *Doc. 43* at ¶77 and *Doc. 50* at ¶77.

• The strategic imagination to identify and assess competing priorities for the organization's resources.

*Id*. at ¶15.

A search committee, consisting of some of the Commissioners of the PHRC, was chosen to screen candidates and conduct the first round of interviews for the new Executive Director. *Id*. at ¶12.   When the search for the new Executive Director began, the Chairperson of the PHRC was Steven Glassman, and the Vice-Chairperson was Raquel Yiengst. *Doc. 43* at ¶16 and *Doc. 50* at ¶16.   On June 1, 2011, Commissioner Robinson was appointed as Chairperson of the PHRC, taking the place of Chairperson Glassman. *Id.* at ¶24.   Further, while Glassman was initially the chairman of the search committee, after he retired, Robinson become chairperson of the search committee. *Id*. at ¶25.

NEOGOV is a web-based program that the Commonwealth's Bureau of State Employment (BSE) uses to fill non-civil service positions. *Doc. 51* at ¶20.   The BSE uses NEOGOV to refer candidates to be considered or interviewed for open positions. *Id.* at ¶22.   Once applicants apply for a position using NEOGOV, BSE generates a list of qualified candidates for the position and that list is made available to the agency seeking to fill the vacant position. *Id.* at ¶23.

On March 15, 2011, the PHRC posted an advertisement for the position of Executive Director. *Id.* at ¶5.   Waters, who was previously employed as an Assistant Chief Counsel for the PHRC, submitted an application to fill the position. *Id.* at ¶¶16 & 17.   NEOGOV referred Waters to the PHRC as one of many applicants that met the job description's requirements. *Id.* at ¶19.

### C.   First-Round Interviews.

More than 60 persons applied for the position of Executive Director, and the search committee initially selected 10 applicants to interview during the first round of interviews. *Doc. 50* at ¶13.   Waters was one of the 10 selected to receive a first-round interview; JoAnn Edwards, who eventually became the new Executive Director, was not. *Id.*   One of the applicants selected to be interviewed cancelled his or her interview, leaving nine candidates selected by the search committee to be interviewed during the first round of interviews. *Id.*

James A. Honchar, the Deputy Secretary of the Pennsylvania Office of Administration, informed the PHRC that it was required to consider for the Executive Director position any candidates that the administration referred to it and that, prior to any final decision or job offer, the PHRC should consult with the Governor's Deputy Chief of Staff to discuss any recommendations. *Doc. 44-9* at 2.

Later, the Governor's Office identified the following four "preferred" candidates to be interviewed: Kathy Barley, Michael Divin, Anna P. Gomez, and Hector Ortiz. *Id.* at 4.   According to the PHRC, it is unclear if Edwards was included as one of the Governor's preferred candidates. *Doc. 43* at ¶23.   According to Waters, however, Edwards was not among the individuals on the Governor's list, and Edwards only received a first-round interview after Robinson falsely claimed that she was. *Doc. 50* at ¶¶13 & 23.   Prior to becoming the Executive Director of the PHRC, Edwards had never met or spoken to the Governor, Chairperson Robinson, or any of the PHRC commissioners. *Doc. 43* at ¶81 and *Doc. 50* at ¶81.

The search committee scheduled 14 first-round interviews (the nine originally selected by the search committee, the four expressly identified by the Governor, and Edwards). *See Doc. 43* at ¶13 and *Doc. 50* at ¶13.   The first round of interviews were conducted by commissioners from the search committee. *Doc. 43* at ¶14 and *Doc. 50* at ¶14.   According to the PHRC, the top three candidates would move on to the second and final round. *Doc. 43* at ¶14.   According to Waters, however, the top five candidates were supposed to advance to the second round and be interviewed by the full commission. *Doc. 50* at 14.

The 14 persons interviewed in the first round were interviewed by Commissioners Garman, Mondesire, Robinson, Waters, Woodall, and Yiengst

11

during a three day period (June 9, 10, 20, 2011) and were interviewed in the following order: June 9th—Kelley Hodge, Joyce Davis, Michael Diven, Sheila Ford, and Kathy Barley; June 10th—Ellen DiDomenico, Hector Ortiz, Kathy Morrison, JoAnn Edwards, Ana Gomez, and Kathryn Waters; and June 20th—Kaaba Brunson, Peter Speaks, and Marc Brenman. *Doc. 43* at ¶26 and *Doc. 50* at ¶26.   Members of the search committee were given binders containing application materials and score sheets. *Doc. 50* at ¶27.   The score sheets contained nine categories, with each category assigned a weight factor of 1, 2 or 4. *Id.* at ¶28. When assigning a score, the Commissioners could rate the candidate 1, 2, or 3. *Id.* The maximum score a candidate could receive was 66 and the minimum score was 22. *See e.g. Doc. 44-8* at 54.

### D.   Results of the First-Round Interviews.

The parties dispute what happened after the first-round interviews.   Because Waters is the nonmoving party, when supported by evidence in the record, we accept her version of the events.   In order to understand what is in dispute, however, we begin by setting forth the PHRC's version of what happened after the first-round interviews.

### 1.   The PHRC's Version.

According to the PHRC, after all of the first-round interviews were completed, Chairperson Robinson polled the commissioners and asked for their three top-rated candidates. *Doc. 43* at ¶29.   Everyone then left the meeting taking their interview binders with them, except for Chairperson Robinson and Commissioner Waters who stayed behind. *Id.* at ¶30.   Immediately after this occurred, Chairperson Robinson was told by PHRC Chief Counsel and acting Executive Director Michael Hardiman that it was not proper to just get the top three candidates from each commissioner; rather, the scores from all of the commissioners reflecting what the scoring was for each of the 14 interviewees were needed to properly determine the top three candidates who were to move on to the second and final round of interviews. *Id.* at ¶31.

Chairperson Robinson sent an email to the commissioners stating that according to Chief Counsel Hardiman, he needed the scores for all 14 interviewees. *Id.* at ¶32.   Commissioner Garmon and Commissioner Yiengst provided scores to Chairperson Robinson. *Id.* at ¶¶33 & 36.   Commissioner Mondesire never provided his full scores to Chairperson Robinson. *Id.* at ¶37.   According to the PHRC, Commissioner Woodall would only give three scores to Chairperson Robinson over the phone (Brunson 66, Waters 60, Brenman 58), and when pushed to provide the

scores for the other 11 candidates, Woodall told Chairman Robinson just to give them all the lowest possible score. *Id.* at ¶38.   Commissioner Woodall did not turn in his interview binder until the day of his deposition in this case—March, 10, 2015. *Id.* at ¶39.   Commissioner Woodall's binder reflects that he gave Brunson a perfect score of 66, that he did not provide any written scores for four of the candidates including Waters and Edwards, and that he gave only partial scores for nine other candidates. *Id.* at ¶¶40 & 41.   Although Commissioner Woodall testified that he stopped writing down scores in his binder after Chairperson Robinson made it clear that Robinson's preferred candidate was JoAnn Edwards, Brunson (for whom Commissioner Woodall wrote down scores) was interviewed after Edwards (Edwards was interviewed on June 10, 2011, and Brunson was interviewed on June 20, 2011). *Id.* at ¶42.

According to the PHRC, because Commissioner Mondesire never turned in his scores and Commissioner Woodall gave scores for only three candidates, Chairman Robinson moved to have their scores discounted, which was approved by the commissioners. *Id.* at ¶43.   More specifically, on June 23, 2011, Robinson sent an email to members of the search committee explaining that he had not received complete scores from two members. *Doc. 44-9* at 8.   He further explained that one of those two members stated that he had previously provided rating for two

candidates and when questioned about the other 12, advised Robinson to rate them all at 22, the lowest rating possible. *Id.*   According to Robinson's email, because that was inconsistent with the established procedure, he did not include those ratings in tabulating the scores for the candidates. *Id.*

According to the PHRC, based on the scores received from Commissioners Robinson, Waters, Yiengst, and Garmon, the top three candidates and their scores were: Hodge (59.75 points), Edwards (58.25), and Ortiz (56.75 points), and Waters ranked 7th with a score of 52.25. *Doc. 43* at ¶¶46 & 47.   Commissioner Yiengst, however, made scoring errors in her binder in that in some instances she gave interviewees scores above 3 (Brunson and Edwards), she gave one interviewee (Morrison) a 0.5, and in two instances, she added the final scores incorrectly (giving Ford a 52 instead of a 54, and giving Waters a 56 instead of a 46). *Id.* at ¶34. Correcting the errors in Yiengst's scoring binder, Hodge, Ortiz, and Edwards would still have been the top three candidates with the following scores: Hodge (59.75), Ortiz (56.75) and Edwards (56.75), and Waters would have dropped to ninth place with a score of 49.75. *Id.* at ¶¶48 & 49.

### 2.   Waters's Version.

According to Waters, after finishing the first-round interviews, Chairman Robinson told the search committee that he wanted Edwards to be ranked within the top three. *Doc. 51* at ¶42.   The search committee members provided scores for their top three candidates. *Doc. 50* at ¶29.   Waters earned one of the three highest scores for applicants interviewed in the first round *See Doc. 50-4* at 2.[3]   Edwards failed to score enough points to earn a second-round interview. *Id.*   Chairman Robinson threatened Commissioner Woodall and other commissioners concerning reappointment of their seats if Edwards was not selected as the Executive Director, and he made reference to the fact that Edwards's application had been submitted by the Governor's Office and that it was expected that she would be chosen. *Id.*   After determining that Edwards did not rank within the top three, Chairman Robinson had a conversation with Hardiman, who advised that all of the binders should have been collected. *Doc. 50* at ¶32.

According to Waters, Commissioner Woodall did provide scores for all candidates. *Id.* at ¶38.   In that regard, although Commissioner Woodall's binder

---

[3]  Although Waters cited Exhibit 2 in support of this assertion, the actual exhibit that supports the assertion is Exhibit 4 (*Doc. 50-4*), which is a declaration from Commissioner Woodall.

does not reflect scores for all the candidates, Woodall maintained candidate scores on a separate sheet of scrap paper, and he provided those scores to Robinson. *Id.* at ¶¶40-42.   Robinson did not seek input from other committee members before making the decision not to include any scores from Commissioners Woodall and Mondesire. *Id.* at ¶44.   According to Waters, Robinson manipulated the system by voiding Woodall's scores and including inflated scores for Edwards. *Id.* at ¶46. Had Woodall's scores been included, Waters would have advanced to the second round of interviews. *Id.*

On the record at several meetings, Commissioner Woodall pointed out these matters and unsuccessfully attempted to correct the selection process. *Doc. 50-4* at 2. Subsequently, Woodall and Waters were not reappointed as Commissioners of the PHRC. *Id.* and *Doc. 44-3* at 48-49.

### E.   The Second-Round Interviews and the New Executive Director.

After the first round interviews, the following three candidates received a second interview: Hodge, Edwards, and Ortiz. *Doc. 43* at ¶46 and *Doc. 50* at ¶46. The ratings of the candidates from the first round of interviews did not carry over to the second and final round; everyone started with a "blank slate." *Id*. at ¶53. Immediately prior to the second round of interviews, the Commission voted to

permit two others to be interviewed for the Executive Director position—Michael Hardiman (a white male who was acting Executive Director and Chief Counsel of the PHRC and who had not applied for the position) and Kaaba Brunson (a black male who had been a regional director for the PHRC for many years). *Id*. at ¶54. Chairperson Robinson as well as Commissioners Yiengst and Bolstein voted against allowing Hardiman to be interviewed for the position because he had not applied for it. *Id*. at ¶55.

After the second round of interviews, the top three candidates were Michael Hardiman, JoAnn Edwards, and Kaaba Brunson. *Id*. at ¶56.   Chairperson Robinson refused to submit Michael Hardiman's name to the Governor's Office even though he was ranked number one after the completion of the second-round interviews. *Id*. at ¶57.   Instead, he recommended the second highest candidate, JoAnn Edwards, and he explained to the Governor's Office that although Hardiman was actually ranked first, because Hardiman did not apply for the position, Robinson was not putting forth his name. *Id*.   On August 22, 2011, a motion to ratify Edwards as the Executive Director was passed unanimously, with commissioners Waters, Mondesire, and Woodall abstaining. *Id*. at ¶58.

Waters filed a complaint with the Equal Employment Opportunity Commission (EEOC) alleging that the PHRC discriminated against her when it did

18

not select her to fill the position of Executive Director. *Doc. 51* at ¶69.   After

conducting an investigation, the EEOC determined that there is reasonable cause to

believe that the PHRC discriminated against Waters based on her race. *Doc. 50-8* at

3.

## IV.   Discussion.

Title VII provides that it is "an unlawful employment practice for an

employer to fail or refuse to hire or to discharge any individual, or otherwise to

discriminate against any individual with respect to his compensation, terms,

conditions, or privileges of employment, because of such individual's race, color,

religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1).   Waters claims that

the PHRC discriminated against her because of her race in violation of Title VII.

Under Title VII, a plaintiff may pursue a claim for discrimination under either

a pretext theory or a mixed-motive theory. *Makky v. Chertoff*, 541 F.3d 205, 213 (3d

Cir. 2008).   In moving for summary judgment, the PHRC relies on the

burden-shifting framework established in *McDonnell Douglas Corp. v. Green,* 411

U.S. 792 (1973), applicable to pretext cases.   Waters responds that under a

mixed-motives analysis, the PHRC is not entitled to summary judgment.   She

contends, in the alternative, that under a pretext analysis, the PHRC is also not

entitled to summary judgment.   We begin by addressing the claim under a mixed-motive analysis.

### A.   Mixed-Motive Analysis.

Under the mixed-motive theory, which was set forth in *Price Waterhouse v. Hopkins,* 490 U.S. 228 (1989), "a plaintiff may show that an employment decision was made based on both legitimate and illegitimate reasons." *Makky,* 541 F.3d at 213.   In part, in response to *Price Waterhouse*, Congress passed the Civil Rights Act of 1991, which set forth standards applicable to mixed-motive cases. *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 94 (2003).   Under the Act, "an unlawful employment practice is established when the complaining party demonstrates that race, color, religion, sex, or national origin was a motivating factor for any employment practice, even though other factors also motivated the practice." 42 U.S.C. §2000e-2(m).   The Act also provides a "limited affirmative defense" to a defendant in a mixed-motive case if the defendant demonstrates that it "would have taken the same action in the absence of the impermissible motivating factor." *Desert Palace,* 539 U.S. at 94; 42 U.S.C. § 200e-5(g)(2)(B).   While not absolving the defendant of liability, this defense "restricts the remedies available to a plaintiff." *Desert Palace,* 539 U.S. at 94.   "The available remedies include only

declaratory relief, certain types of injunctive relief, and attorney's fees and costs. *Id.*; 42 U.S.C. § 200e-5(g)(2)(B)(i).   If the defense is proven, the court may not award the plaintiff damages or back pay and may not "issue an order requiring admission, reinstatement, hiring, [or] promotion." 42 U.S.C. § 200e-5(g)(2)(B)(ii).

"Although the courts were divided about whether a discrimination claim brought under a mixed-motive theory had to be proven with direct evidence, the Supreme Court resolved the circuit split in *Desert Palace* by holding that a plaintiff does not need to present 'direct evidence' of discrimination to proceed on a mixed-motive theory of discrimination under Title VII." *Makky*, 541 F.3d at 214 (quoting *Desert Palace,* 539 U.S. at 92).   To proceed under a mixed-motive theory, "a plaintiff need only present sufficient evidence for a reasonable jury to conclude, by a preponderance of the evidence, that 'race, color, religion, sex, or national origin was a motivating factor for any employment practice." *Desert Palace,* 539 U.S. at 101.   "The evidence that a plaintiff must present 'must be such that it demonstrates that the decisionmakers placed substantial negative reliance on an illegitimate criterion in reaching their decision.'" *DeCarolis v. Presbyterian Med. Ctr. of Univ. of Pennsylvania Health Sys.*, 554 F. App'x 100, 103 (3d Cir. 2014)(quoting *Walden v. Georgia-Pacific Corp.*, 126 F.3d 513 (3d Cir. 1997).   Statements by individuals involved in the hiring process may satisfy that requirement. *See Id.*

21

In addition, in order to establish a prima facie case under a mixed-motive analysis, "a plaintiff must establish that she was qualified for the job she sought to obtain or retain." *Sosa v. Napolitano*, 318 F. App'x 68, 72 (3d Cir. 2009); *Makky,* 541 F.3d at 215 ("We hold today that a mixed-motive plaintiff has failed to establish a prima facie case of a Title VII employment discrimination claim if there is unchallenged objective evidence that s/he did not possess the minimal qualifications for the position plaintiff sought to obtain or retain."). A mixed-motive plaintiff is not required to establish that she was "subjectively qualified," i.e., able to perform the job well. *Makky,* 541 F.3d at 215. Rather, she is only required to show that she possessed "the objective baseline qualifications" to do the job:

> This involves inquiry only into the bare minimum requirement necessary to perform the job at issue. Typically, this minimum requirement will take the form of some type of licensing requirement, such as a medical, law, or pilot's license, or an analogous requirement measured by an external or independent body rather than the court or the jury. This requirement comports with the purpose of the prima facie case as discussed by the Supreme Court in *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 254, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), insofar as it will eliminate the "most common nondiscriminatory reason[ ] for the plaintiff's rejection"—lack of minimum baseline qualification. We caution that we are not imposing a requirement that mixed-motive plaintiffs show that they were subjectively qualified for their jobs, i.e., performed their jobs well. Rather, we speak only in terms of an absolute minimum requirement of qualification, best characterized in those circumstances that

22

require a license or a similar prerequisite in order to perform the
job.

*Makky*, 541 F.3d at 215-16.

The PHRC contends that Waters was not qualified for the position because
she does not have the business or financial acumen, writing skills, or attention to
detail necessary for the job.   But Waters has presented evidence from which it can
reasonably be inferred that she was qualified: the NEOGOV system rated her as
qualified, and she was selected by the search committee to receive a first-round
interview.   Thus, the defendant is not entitled to summary judgment on the basis
that Waters was not qualified for the position.

Waters relies on statements purportedly made by Chairman Robinson that he
did not want a minority to fill the position of Executive Director to support her claim
under a mixed-motive theory.   More specifically, she relies on Commissioner
Sylvia Waters's deposition testimony regarding Chairman Robinson's remarks:

> A.   He did not want someone with heavy civil rights
> background.   He did not want a minority.   When I say a
> minority, I'm talking about black or brown.
> Q.   And did he tell you this?
> A.   Yes.
> Q.   Jerry Robinson told you that he did not want an
> Executive Director who was a minority?
> A.   Jerry Robinson told me that this is a new time for
> the Commission and we needed a Commissioner that would
> reflect that and the old stuff.   And he used very derogatory
> terms to talk about the old leadership.   And we didn't want part

of that, he didn't want any part of that and we didn't want anyone
that reflected any of that.

      Q.   Okay.   So correct me if I'm wrong, Jerry
Robinson told you that he did not want an Executive Director
who was a minority?

      A.   Yes.   He didn't want—yes.

      Q.   Okay.   And when did that conversation take
place?

      A.   It took place on more than one occasion over the
summer.   But the groundwork was certainly set before that
based on things that he had said and after the selection was made
based on his behavior and things that he had said because he was
on a mission then, clearly to excise the Commission of its
minority leadership.

      Q.   But he said this several times to you, personally,
over the summer?

      A.   Yeah.

*Doc. 44-3* at 27-28.

Based on Robinson's statements that he did not want a minority to fill the

position of Executive Director, a reasonable jury could conclude that race was a

motivating factor in the employment decision.   The PHRC contends, however, that

Robinson's purported statements about not wanting an executive director who is a

minority are hearsay.   Federal Rule of Evidence 801(d)(2)(D) provides that a

statement that is offered against an opposing party and "was made by the party's

agent or employee on a matter within the scope of that relationship and while it

existed" is not hearsay.   While neither party has briefed the applicability of F.R.E.

801(d)(2)(D), it appears that Robinson's statements meet the requirements of that

Rule, and, accordingly, are not hearsay. *See generally Kitzmiller v. Dover Area School Dist.*, No. 04-CV-2688, 2005 WL 4147867 (M.D.Pa. Sept. 22, 2005)(admitting statements by School Board members made during School Board meetings under F.R.E. 801(d)(2)(D) in a case against the School Board).

The PHRC also denies that Robinson made such statements.   That denial, however, raises a factual dispute that cannot be resolved on summary judgment. Finally, the PHRC contends that it, not Chairman Robinson, made the ultimate hiring decision.   But given Robinson's involvement in the tallying of scores, the scheduling of interviews, and the recommendation to the Governor's office, it is for a factfinder to determine whether Robinson's purported discriminatory attitude affected the decision-making process.   Finally, the PHRC contends that Robinson's alleged statement was taken out of context and is only evidence that there was a division among members of the Commission as to the type of candidate that should fill the Executive Director position: some commissioners believed that the Executive Director should have a strong civil-rights background and presumably should be African American, while others believed that given the financial problems facing the PHRC at the time, the Executive Director should have strong business acumen.   Again, it is for the factfinder to determine how the statements should be

construed.   That it is reasonably possible for the statements to be construed as showing a discriminatory motive is enough for Waters to avoid summary judgment.

In sum, Waters has presented evidence from which a factfinder could conclude that, to her detriment, race was a motivating factor in the choice of the Executive Director.   Accordingly, the PHRC is not entitled to summary judgment as to Waters's claim under a mixed-motive analysis.

### B.   Pretext Analysis.

In addition to asserting that her claim survives summary judgment under a mixed-motive analysis, Waters contends that her claim also survives under a pretext analysis.   A pretext analysis proceeds under the burden-shifting framework of *McDonnell Douglas*, which has three steps.   First, the plaintiff bears the burden of establishing a prima facie case of discrimination. *Burton v. Teleflex Inc.*, 707 F.3d 417, 426 (3d Cir. 2013).   Second, if the plaintiff establishes a prima facie case, the burden of production then shifts to the defendant, who must offer a legitimate non-discriminatory reason for the action. *Id.*   Third, if the defendant satisfies that burden, the burden of production then shifts back to the plaintiff and the plaintiff must demonstrate that the defendant's proffered reason was merely a pretext for discrimination. *Id.*   While the *McDonnel Douglas* framework involves shifting

26

burdens of production, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Texas Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 253 (1981).

The PHRC contends that Waters cannot establish a prima facie case of discrimination and that, even if she can establish a prima facie case, she cannot demonstrate that its reasons for not hiring her were pretext for discrimination.  We turn first to the question whether Waters can establish a prima facie case of discrimination.

### 1.   Prima Facie Case.

The purpose of the prima facie case is to eliminate the most common nondiscriminatory reasons for the defendant's actions, and the plaintiff's burden at the prima facie stage is not onerous. *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 253-54 (1981).   Establishment of the prima facie case creates a presumption of unlawful discrimination. *Id.* at 254.   The elements of a prima facie case raise an inference of discrimination because the law presumes that the defendant's actions comprising the prima facie case, if not otherwise explained, are more likely than not based on the consideration of impermissible factors. *Id.* at 254. There is no rigid formulation of a prima facie case under *McDonnell Douglas;* the

elements of a prima facie case vary depending on the type of claim and the factual situation. *Matczak v. Frankford Candy & Chocolate Co.*, 136 F.3d 933, 938 (3d Cir. 1997).

To establish a prima facie case of discrimination, a plaintiff generally must show that (1) she is a member of a protected class, (2) she was qualified for the position, (3) she suffered an adverse employment action, and (4) the action occurred under circumstances that could give rise to an inference of intentional discrimination. *Paradoa v. Philadelphia Hous. Auth.*, No. 14-3191, 2015 WL 1923654, at *2 (3d Cir. Apr. 29, 2015).   The PHRC addresses only the second element of a prima facie case; it contends that Waters was not qualified for the position.   But, as discussed before in connection with the mixed-motive analysis, the evidence shows that the NEOGOV system rated Waters as qualified, and she was selected by the search committee to receive a first-round interview.   Thus, the PHRC is not entitled to summary judgment on the basis that Waters was not qualified for the position.   And given that the PHRC does not address the other elements of a prima facie case, we move on to the next step of the *McDonnell Douglas* burden-shifting analysis.

## 2.   Legitimate, NonDiscriminatory Reasons.

Once the plaintiff establishes a prima facie case, the burden of production shifts to the defendant to articulate some legitimate, nondiscriminatory reason for the adverse employment decision. *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994).   An employer satisfies its burden of production by introducing evidence that would permit the conclusion that there was a nondiscriminatory reason for the unfavorable employment decision. *Id*.   "The employer need not prove that the tendered reason *actually* motivated its behavior, as throughout this burden-shifting paradigm the ultimate burden of proving intentional discrimination always rests with the plaintiff." *Id*.

Here, the PHRC contends that Waters's scores during the first-round interviews did not qualify her to advance to the second-round interviews and thus did not qualify her to be the Executive Director.   Failure to score well enough on an interview to advance can be a legitimate, nondiscriminatory reason for not hiring a candidate. *See Thompson v. Bridgeton Bd. of Educ.*, 613 F. App'x 105, 108 (3d Cir. 2015)(recognizing poor interview performance as a legitimate non-discriminatory reason for refusal to hire).   Thus, the PHRC has presented a legitimate, nondiscriminatory reason for not hiring Waters.

### 3.   Pretext.

If the employer meets its relatively light burden by articulating a legitimate reason for its action, the burden of production rebounds to the plaintiff.   To defeat summary judgment the plaintiff must point to some evidence, direct or circumstantial, from which a fact finder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a determinative cause of the employer's action. *Daniels v. Sch. Dist. of Philadelphia*, 776 F.3d 181, 198-99 (3d Cir. 2015).   To avoid summary judgment, "the plaintiff's evidence rebutting the employer's proffered legitimate reasons must allow a fact finder reasonably to infer that *each* of the employer's proffered non-discriminatory reasons was either a *post hoc* fabrication or otherwise did not actually motivate the employment action (that is, the proffered reason is a pretext)." *Fuentes*, 32 F.3d at 764 (citations omitted). "To discredit the employer's proffered reason, the plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether a discriminatory animus motivated the employer, not whether the employer is 'wise, shrewd, prudent, or competent.'" *Brewer v. Quaker State Oil Refining Corp.*, 72 F.3d 326, 331 (3d Cir. 1995)(quoting *Fuentes*, 32 F.3d at 765).   Rather, the plaintiff must demonstrate "such weaknesses, implausibilities, inconsistencies,

incoherencies, or contradictions" in the employer's proffered reasons that a reasonable fact finder could rationally find the proffered reasons unworthy of credence and infer that the employer did not act for those asserted reasons. *Fuentes*, 32 F.3d at 765.

Waters has presented sufficient evidence from which a reasonable factfinder could conclude that the PHRC's reasons for not advancing her to the second round were pretext for discrimination. There are genuine factual disputes about whether Waters scored high enough to advance to the second round. Although the PHRC presented evidence that she did not, she presented evidence that she did. Specifically, she presented a declaration from Commissioner Woodall in which he states:

> All search committee commissioners provided scores of their top three candidates to Chairman Robinson prior to the selection of the candidates that had earned a second round interview. Based upon the sum of all scores added of all search committee commissioners, Ms. Waters-Perez earned one of the top three highest scores of all applicants in the first round of interviews.

*Doc. 50-4* at 2. Woodall also states that "Edwards failed to score enough points to earn a second round interview." *Id.* Based on this evidence coupled with Robinson's statements that he did not want a minority to be the Executive Director and his involvement in pushing for Edwards to advance, the factfinder could

reasonably conclude that the PHRC's reasons for not advancing Waters to the second round but advancing Edwards, are unworthy of belief and are pretext for discrimination.[4]   Accordingly, the PHRC is not entitled to summary judgment as to Waters's claim under a pretext analysis.

In sum, given Robinson's statements about not wanting a minority to fill the position, his pushing for Edwards to fill the position, and Woodall's testimony that while Waters scored high enough to advance to the second round, Edwards did not, Waters has presented enough evidence to survive summary judgment under either a mixed-motive analysis or a pretext analysis.

## V.   Recommendations.

Accordingly, for the foregoing reasons, it is recommended that the PHRC's motion (doc. 42) for summary judgment be denied.

_____

[4] Waters also presented evidence that in October of 2010, Chairman Robinson referred to a candidate for a different position as a "nigger."   More specifically, he allegedly said: "I did legal work for him [the candidate] and the nigger never paid me." *See Doc. 50-5* at 7.   Robinson later told JoAnn Edwards that in black society, it is acceptable for a black man to use that term to refer to another black man. *See Doc. 44-7* at 47.   The PHRC contends that Robinson's statement is hearsay and that use of the term "nigger" at a time unrelated to the selection process for the Executive Director is not indicative of racial bias in the selection process.   We do not address Robinson's use of the word "nigger" because even without that evidence, Waters has presented sufficient evidence to survive summary judgment.

The Parties are further placed on notice that pursuant to Local Rule 72.3:

Any party may object to a magistrate judge's proposed findings, recommendations or report addressing a motion or matter described in 28 U.S.C. § 636 (b)(1)(B) or making a recommendation for the disposition of a prisoner case or a habeas corpus petition within fourteen (14) days after being served with a copy thereof.   Such party shall file with the clerk of court, and serve on the magistrate judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations or report to which objection is made and the basis for such objections.   The briefing requirements set forth in Local Rule 72.2 shall apply.   A judge shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge.   The judge, however, need conduct a new hearing only in his or her discretion or where required by law, and may consider the record developed before the magistrate judge, making his or her own determination on the basis of that record.   The judge may also receive further evidence, recall witnesses or recommit the matter to the magistrate judge with instructions.

Submitted this 18th day of December, 2015.


*S/Susan E. Schwab*
Susan E. Schwab
United States Magistrate Judge